IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ANTONIO GIORDANO, M.D. | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| PIER PAOLO CLAUDIO, M.D., ET AL. | : | NO. 09-1456 |

**MEMORANDUM**

Padova, J.                                                                                    May 13, 2010

Plaintiff Antonio Giordano, M.D. filed the instant action against Pier Paolo Claudio, M.D. and Robert Waters, Esq., alleging defamation related to a dispute over authorship credit for an academic article. In response, Claudio and Waters filed a Counterclaim and Third-Party Complaint against Giordano and Valentina Caracciolo, Ph.D, and subsequently filed an Amended Counterclaim and Third-Party Complaint, adding Marcella Macaluso, Ph.D as a third-party defendant. We previously dismissed all claims against Caracciolo and Macaluso, and now before the Court is Counter-Defendant Giordano's Motion to Dismiss Claudio and Waters's Amended Counterclaim. For the following reasons, we grant the Motion in part and deny it in part.

I.      BACKGROUND

The Amended Counterclaim alleges the following facts.[1]  Giordano is the Director for the Center of Biotechnology, College of Science and Technology at Temple University, a Professor of Biology for the College of Science and Technology at Temple University, and the Director of the

---

[1]The parties have attached numerous documents as exhibits to the Motion to Dismiss and the Response in Opposition thereto. We have considered those exhibits that are integral to the Amended Counterclaim. See Lum v. Bank of Am., 361 F.3d 217, 221 n.3 (3d Cir. 2004) (explaining that, in deciding a Motion to Dismiss, a district court considers documents that are "'integral or explicitly relied upon in the complaint'" and thus form the basis of a claim (quoting In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997))).  We note, however, that Claudio and Waters did not file Exhibits 2, 3, 4, 5, or 6 to the Response in Opposition to the Motion to Dismiss.

Sbarro Institute for Cancer Research and Molecular Medicine in Philadelphia, Pennsylvania. (Am. Countercl. ¶ 1.) Giordano is also the Reviews Editor and Associate Editor of the Journal of Cellular Physiology ("JCP"). (Id. ¶ 20.) Caracciolo is a post-doctoral fellow at Temple University. (Id. ¶ 2.) During the relevant time period, Macaluso was a Research Assistant Professor in the Biology Department at Temple University. (Id. ¶ 3.) Claudio was employed at Temple University until October 31, 2006, at which point he began employment at Marshall University in Huntington, West Virginia, where he set up a laboratory. (Id. ¶ 13.) From 1993 to 2006, Claudio worked in close association with Giordano in Giordano's laboratory. (Id. ¶ 4.) During that time, he performed a variety of research-related activities in association with Giordano, Caracciolo, and Macaluso. (Id. ¶ 5.)

In September 2004, research commenced on the National Institutes of Health ("NIH") Program Project 5P0INS036466-11 ("the Project"). (Id. ¶ 6.) The final experiments were completed in 2006, and the Project concluded in May 2008. (Id. ¶¶ 6, 12.) Claudio served as Co-Principal Investigator for the Project from approximately September 2004 through October 2006, during which time he also directed research for the Project and performed research-related activities. (Id. ¶ 7.) Giordano served as Principal Investigator of the Project. (Id. ¶ 8.)

On or about May 19, 2006, Giordano and Dr. Kamel Khalili, Director of the Project, asked Claudio to prepare a summary manuscript suitable for publication that would be submitted to the NIH as a status update. (Id.) On approximately May 20, 2006, Caracciolo sent Claudio an email including "materials and methods" information to be included in Claudio's draft. (Id. ¶ 9.) Claudio completed the progress report around May 22, 2006; it was subsequently submitted to the NIH. (Id. ¶ 10.) Claudio sent updated drafts of his report to Caracciolo on or around September 21, 2006 and

October 19, 2006.  (Id. ¶¶ 11, 12.)   After Claudio left Temple University, he continued to communicate with Caracciolo regarding the Project, and Caracciolo used his cooperation, input, and knowledge to complete the Project.  (Id. ¶ 14.)

On or about March 26, 2007, the JCP published an article entitled "Interplay Between the Retinoblastoma Related pRb2/p130 and E2F-4 and -5 in Relation to JCV-Tag" ("the Article").  (Id. ¶ 19.)  The Article is substantially similar in text and substance to the reports Claudio prepared in 2006.  (Id.)  In November 2006, Claudio had reminded Caracciolo via email of his co-authorship of the upcoming published article.  (Id. ¶ 15.)  Giordano and Caracciolo had represented to Claudio that he would receive authorship credit if he contributed to and drafted significant portions of the Article. (Id. ¶ 38.)  However, before publication of the Article, Claudio's authorship credit was removed or omitted.  (Id. ¶ 22.)  Instead, there was a note in the "Acknowledgments" section of the Article stating, "A special thank [sic] goes to professor Pier Paolo Claudio."  (Id.)  Claudio had not been informed that he would not receive authorship credit, and did not discover that he did not receive authorship credit until the Article was published.  (Id. ¶¶ 15, 23.)

On June 21, 2007, Claudio sent a letter to Temple University asking that the University conduct an inquiry into the reasons why he did not receive authorship credit.  (Id. ¶ 23.)[2]  On the same day, he contacted the JCP, and specifically Gary Stein, Ph.D, to request assistance in rectifying the authorship credit error.  (Id. ¶ 23.)  Stein is the Executive Editor of the JCP and is a member of the Sbarro Institute Scientific Advisory Board.  (Id. ¶ 21.)  On or about July 23, 2007, Giordano responded in a letter to Stein ("the Stein Letter") to Claudio's communication to Stein regarding the

_____

[2]Giordano's Complaint clarifies that Waters, Claudio's counsel, sent the letter on Claudio's behalf.  (Compl. ¶ 17.)

authorship credit dispute, and stated that Claudio's contribution to the Project was not sufficient to support authorship credit in the Article, and that Stein could verify Giordano's position by communicating with Caracciolo and Macaluso.  (Id. ¶ 24.)

On or about August 9 and October 4, 2007, Claudio supplied Temple University with additional documentation demonstrating his contributions to the Project and the Article.  (Id. ¶ 25.) On or about November 28, 2007, Temple University conducted a teleconference interview with Claudio, in the presence of counsel.  (Id. ¶ 26.)  At the request of Temple University personnel, Claudio submitted additional documents in support of his allegations and in response to specific questions raised by Temple University personnel on approximately December 3, 2007.  (Id. ¶ 27.) After an investigation, a subcommittee appointed by the Temple University Faculty Senate Personnel Review Committee found that Claudio merited authorship credit on the Article.  (Id. ¶ 28.) Giordano nevertheless refused to correct the authorship credit, claimed that the investigative subcommittee was biased and its findings incorrect, and instituted a lawsuit alleging defamation against Claudio and Waters.  (Id. ¶¶ 29-30.)  Following Giordano's allegations of bias, Ann Weaver Hart, the President of Temple University, appointed a second committee, which conducted an investigation and obtained testimony from witnesses including Giordano and Claudio.  (Id. ¶¶ 31-32.)  The second investigative committee issued a report of its findings on July 19, 2009, stating that "'our Committee has unanimously determined that the scholarship and contributions to the active research by Professor Pier Paolo Claudio warrant his inclusion as a co-author on the referenced paper.'"  (Id. ¶¶ 32-33.) Giordano has continued not to take corrective action with respect to the authorship credit.  (Id. ¶ 34.)

The Amended Counterclaim asserts causes of action by Claudio against Giordano for fraud (Count 1); misrepresentation (Count 2); unfair competition (Count 3); conversion (Count 4);

4

defamation (Counts 5-7); unjust enrichment, restitution, and specific performance (Count 8); and civil conspiracy (Count 10). The Amended Counterclaim also asserts a cause of action by Claudio and Waters against Giordano for abuse of process (Count 9).[3] On December 15, 2009, Giordano filed his Motion to Dismiss.

## II. LEGAL STANDARD

When considering a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), we look primarily at the facts alleged in the complaint and its attachments. Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1261 (3d Cir. 1994). We take the factual allegations of the complaint as true and draw all reasonable inferences in favor of the plaintiff. Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008) (citing Pinker v. Roche Holdings Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002)). Legal conclusions, however, receive no deference, and the court is "not bound to accept as true a legal conclusion couched as a factual allegation." Papasan v. Allain, 478 U.S. 265, 286 (1986) (cited with approval in Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).

A plaintiff's pleading obligation is to set forth "a short and plain statement of the claim," Fed. R. Civ. P. 8(a)(2), which gives the defendant "'fair notice of what the . . . claim is and the grounds upon which it rests.'" Twombly, 550 U.S. at 555 (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)). The "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting

---

[3]Initially, the Amended Counterclaim and Third-Party Complaint also named Caracciolo as a third-party defendant as to Counts 1, 2, 3, 4, 8, and 10, and Macaluso as a third-party defendant as to Counts 3, 4, 8, and 10. We dismissed those claims for lack of jurisdiction on November 23, 2009.

Twombly, 550 U.S. at 570). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. (citing Twombly, 550 U.S. at 556). In the end, we will grant a Rule 12(b)(6) motion if the factual allegations in the complaint are not sufficient "to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555 (citing 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, at 235-36 (3d ed. 2004)). A complaint that offers "only 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action,'" or that merely "allege[s] the plaintiff's entitlement to relief," is insufficient. Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009) (quoting Twombly, 550 U.S. at 555). Rather, a complaint must show the plaintiff's entitlement to relief with its facts. Id. at 211 (citing Phillips v. County of Allegheny, 515 F.3d 224, 234-35 (3d Cir. 2008)).

## III.    DISCUSSION

### A.    Counts One and Two: Fraud and Misrepresentation

Count One of the Amended Counterclaim asserts a claim of fraud on behalf of Claudio. It alleges that Giordano knowingly and deliberately misrepresented to Claudio that he would receive authorship credit if he made sufficient contributions to the Article. (Am. Countercl. ¶¶ 38-39.) It further alleges that, in doing so, Giordano intended to induce Claudio to contribute to and draft significant portions of the Article. (Id. ¶ 40.) It also alleges that Claudio was unaware that Giordano intended to omit his name as an author when he submitted the Article to the JCP. (Id. ¶ 42.) The Counterclaim further alleges that Claudio justifiably relied on Giordano's representations regarding authorship credit in making a significant contribution to the Article. (Id. ¶¶ 41, 44.)

Count Two of the Amended Counterclaim asserts a claim of misrepresentation on behalf of Claudio. Claudio's misrepresentation claim makes essentially the same allegations as his fraud

claim. In his Response in Opposition to the Motion to Dismiss, Claudio clarifies that Count Two asserts a claim for fraudulent or intentional misrepresentation, not negligent misrepresentation. (Resp. at 14.) The Pennsylvania courts, however, do not distinguish between causes of action for fraud and intentional misrepresentation. See Gibbs v. Ernst, 647 A.2d 882, 889 (Pa. 1994) (citing W. Page Keaton, Prosser & Keaton on the Law of Torts § 105 (5th ed. 1984); and Restatement (Second) of Torts § 525 (1977)). Counts One and Two thus assert identical claims for fraud against Giordano. Accordingly, we dismiss Count Two of the Amended Counterclaim as duplicative of Count One.

Giordano argues that Count One must be dismissed for failure to state a claim upon which relief may be granted because (1) it is not alleged with sufficient particularity, especially with respect to the nature of Giordano's alleged promise; (2) it is based upon a promise to do something in the future, not the misrepresentation of a past or present material fact; and (3) it is barred by Pennsylvania's "gist of the action" doctrine, which provides that a plaintiff may not recover in tort for claims that actually sound in contract.[4] Under Pennsylvania common law, a fraud or intentional misrepresentation claim must allege the following elements: "(1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance." Id. For fraud claims, Rule 9(b) requires a party to "state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a

---

[4]We need not consider the arguments Giordano makes with respect to Claudio's negligent misrepresentation claim, as Claudio concedes that he does not assert such a claim.

person's mind may be alleged generally." Fed. R. Civ. P. 9(b). In order to satisfy Rule 9(b), a plaintiff "must state the circumstances of the alleged fraud with sufficient particularity to place the defendant on notice of the 'precise conduct with which [it is] charged.'" <u>Frederico v. Home Depot</u>, 507 F.3d 188, 200 (3d Cir. 2007) (alteration in original) (quoting <u>Lum v. Bank of Am.</u>, 361 F.3d 217, 223-24 (3d Cir. 2004)). A plaintiff can meet this requirement "by pleading the 'date, place or time' of the fraud, or through 'alternative means of injecting precision and some measure of substantiation into [his] allegations of fraud.'" <u>Lum</u>, 361 F.3d at 224 (quoting <u>Seville Indus. Mach. Corp. v. Southmost Mach. Corp.</u>, 742 F.2d 786, 791 (3d Cir. 1984)).

Count One of the Amended Counterclaim provides sufficient detail to put Giordano on notice of the allegations leveled against him – that is, that he misrepresented to Claudio in 2006 that he would receive authorship credit if he made sufficient contributions to the Article. Although the Amended Counterclaim does not plead the exact date, place, or time of the alleged fraud, it is sufficiently precise to show that Claudio alleges that he was injured by contributing to the Article in reliance upon Giordano's alleged misrepresentation with respect to the authorship credit and subsequently receiving no authorship credit. Additionally, the Amended Counterclaim as a whole contains sufficiently detailed allegations with respect to the nature of Claudio's injury. Therefore, we conclude that the Amended Counterclaim satisfies Rule 9(b)'s heightened pleading requirement with respect to Count One.

Giordano also argues that Claudio's fraud claims must be dismissed because they allege the misrepresentation of a future promise. "It is well-established that a cause of action for fraud must allege a misrepresentation of a past or present material fact." <u>Krause v. Great Lakes Holdings, Inc.</u>, 563 A.2d 1182, 1187 (Pa. Super. Ct. 1989) (citing <u>Nissenbaum v. Farley</u>, 110 A.2d 230 (Pa. 1955);

Laughlin v. McConnel, 191 A.2d 921 (Pa. Super. Ct. 1963); and Blose v. Martens, 95 A.2d 340 (Pa. Super. Ct. 1953)). In contrast, the breach of a promise to do something in the future does not constitute fraud. Id. (citations omitted). However, an expressed intention to take future action that "does not actually comport with one's true state of mind at that time . . . is a misrepresentation of existing fact" and may serve as the basis for a fraud claim. Phoenix Techs., Inc. v. TRW, Inc., 834 F. Supp. 148, 152 (E.D. Pa. 1993) (citations omitted); see also Mellon Bank Corp. v. First Union Real Estate Equity and Mortgage Invs., 951 F.2d 1399, 1410-11 (3d Cir. 1991) (noting that "[a] statement of present intention which is false when uttered may constitute a fraudulent misrepresentation of fact," but adding that "[s]tatements of intention made at the time of contracting are not fraudulent simply because of a later change of mind" (citations and internal quotations omitted)).

Although the Amended Counterclaim identifies the relevant misrepresentation as Giordano's future promise that Claudio "*would be credited* as an author of the Article" (Am. Countercl. ¶ 38) (emphasis added), it also alleges that when Giordano made the future promise to Claudio of authorship credit, he did so knowing that he intended to omit Claudio's name as an author when he submitted the Article for publication. The determination of whether Giordano honestly intended to name Claudio as an author at the time of the alleged misrepresentation or planned to deceive him entails questions of fact, and we may not now rule as a matter of law that Giordano did not intend to omit Claudio's name from the authorship line. See Rosen v. Commc'n Servs. Group, Inc., 155 F. Supp. 2d 310, 321 (E.D. Pa. 2001) (citing Fox's Foods, Inc. v. Kmart Corp., 870 F. Supp. 599, 608 n.11 (M.D. Pa. 1994); and Phoenix Techs., 834 F. Supp. at 152). Since the Amended Counterclaim alleges that Giordano expressed an intention to grant Claudio authorship credit at the

same time that he did not intend to grant such credit, we find that it alleges the misrepresentation of a present fact.

Finally, Giordano argues that Claudio's fraud claim is barred by the gist of the action doctrine. The gist of the action doctrine prevents plaintiffs from recovering in tort for claims that sound in contract by barring tort claims (1) that arise solely from the contractual relationship between the parties; (2) where "the duties allegedly breached were created and grounded in the contract itself;" (3) where "liability stems from the contract;" and (4) "where the tort claim essentially duplicates a breach of contract claim or the success of which is wholly dependent" on the success of the breach of contract claim.[5] eToll, Inc. v. Elias/Savion Advertising, Inc., 811 A.2d 10, 19 (Pa. Super. Ct. 2002) (internal quotations omitted). The purpose of the doctrine is "to maintain the conceptual distinction between the theories of breach of contract and tort by preventing a plaintiff from recasting ordinary breach of contract claims as tort claims." Sunburst Paper, LLC v. Keating Fibre Int'l, Inc., Civ. A. No. 06-3959, 2006 WL 3097771, at *2 (E.D. Pa. Oct. 30, 2006) (citing Bash v. Bell Tel. Co. of Pa., 601 A.2d 825, 829 (Pa. Super. Ct. 1992) (superseded by Pa. R. App. P. 314 on other grounds)).

Giordano contends that the gist of Claudio's fraud claim is contractual because any duty to give Claudio authorship credit is grounded in Giordano's alleged promise to do so, intertwined with the contractual obligations created by the promise, and not merely collateral to the promise.

_____

[5]While the Supreme Court of Pennsylvania has not expressly adopted the gist of the action doctrine, it has expressed caution about permitting recovery in tort for contractual breaches, and a number of courts have declared the doctrine viable and predicted that the Supreme Court will adopt it. See, e.g., Reardon v. Allegheny Coll., 926 A.2d 477, 486 & n.10 (Pa. Super. Ct. 2007) (citing cases); Sunburst Paper, LLC v. Keating Fibre Int'l, Inc., Civ. A. No. 06-3959, 2006 WL 3097771, at *2 n.2 (E.D. Pa. Oct. 30, 2006).

Claudio's responses are somewhat inconsistent, but he contends that his claim for authorship credit arises not from any contractual arrangement but from the fact of his authorship of the Article. Viewing the Amended Counterclaim in the light most favorable to Claudio, we cannot rule at this point in the litigation that Claudio's fraud claim "sounds in contract" and is therefore barred by the gist of the action doctrine. Claudio has not alleged the breach or even the existence of a contract regarding authorship credit. Discovery will permit the parties to develop the record as to the nature of Giordano's duty to Claudio. We find that Claudio's fraud allegations, while sparse, are sufficient to survive the Motion to Dismiss. Accordingly, we deny the Motion to Dismiss with respect to Count One of the Amended Counterclaim.

B.    Count Three: Unfair Competition

Count Three of the Amended Counterclaim asserts a cause of action for unfair competition under Pennsylvania common law on behalf of Claudio. It alleges that Giordano engaged in unfair competition by sending the Stein Letter, which stated or implied that Claudio had attempted to pass off the work of others as his own and had never analyzed or been consulted regarding unexpected data that the Article considered, and that Claudio's work on the manuscript that became the Article was insufficient to merit a designation of authorship. (Am. Countercl. ¶ 54.) The Amended Counterclaim further alleges that Giordano's actions constituted an improper attempt to obtain a competitive advantage over Claudio "in the eyes of the relevant customers for medical and scholarly research, namely Stein . . . and those with whom he associates and communicates." (Id. ¶ 59.) According to Claudio, the Stein Letter denigrated his professional reputation and unjustly minimized his competitive advantage. (Id. ¶¶ 54, 60.) The Amended Counterclaim asks the Court to compel Giordano to "disgorge and/or restore any and all revenues, earnings, profits, compensation, benefits

and rights of attribution that may have accrued to or been obtained by [him] as a result of [his] unfair competition" and enjoin him "from further unlawful, unfair and deceptive professional and business practices." (Id. ¶ 62.)

The parties dispute which legal framework the Court should apply to Claudio's unfair competition claim. In the Motion to Dismiss, Giordano argues in part that the Amended Counterclaim fails to state a claim for unfair competition under Section 43(a) of the Lanham Act. The Pennsylvania common law tort of unfair competition is coextensive with the Lanham Act, except for the federal requirement of interstate commerce, Louis Vuitton Malletier & Oakley, Inc. v. Veit, 211 F. Supp. 2d 567, 582 (E.D. Pa. 2002) (citations omitted), where a plaintiff's claim focuses on a defendant's appropriation of the plaintiff's "mark" "with the intent of falsely linking the defendant's product with the plaintiff and capitalizing on the plaintiff's goodwill." Warren Publ'g Co. v. Spurlock, 645 F. Supp. 2d 402, 430 (E.D. Pa. 2009). However, Claudio's unfair competition claim is based not upon a false designation of authorship, infringement of a mark, or the passing off of goods, but upon the Stein Letter, which allegedly denigrated Claudio's reputation. Consequently, the Lanham Act is irrelevant to this claim.

Pennsylvania common law traditionally defines unfair competition as the "passing off" of a rival's goods as one's own, creating confusion between one's own goods and the goods of one's rival. Scanvec Amiable Ltd. v. Chang, 80 F. App'x 171, 180 (3d Cir. 2003) (citations omitted). However, the doctrine of unfair competition in Pennsylvania is not restricted to passing off. Granite State Ins. Co. v. Aamco Transmissions, Inc., 57 F.3d 316, 319 (3d Cir. 1995) (citing Carl A. Colteryahn Dairy, Inc. v. Schneider Dairy, 203 A.2d 469, 473 (Pa. 1964)). "Pennsylvania courts have recognized a cause of action for the common law tort of unfair competition where there is

evidence of, among other things, trademark, trade name, and patent rights infringement, misrepresentation, tortious interference with contract, improper inducement of another's employees, and unlawful use of confidential information." Synthes (U.S.A.) v. Globus Med., Inc., Civ. A. No. 04-1235, 2005 WL 2233441, at *8 (E.D. Pa. Sept. 14, 2005) (citations omitted). For example, in Colteryahn Dairy, the Supreme Court of Pennsylvania held that it was unfair competition to make false or misleading representations regarding the circumstances under which an employee left a former employer. Colteryahn Dairy, 203 A.2d at 473. Additionally, we recognize that the Pennsylvania common law tort of unfair competition is coextensive with the definition set forth in the Restatement (Third) of Unfair Competition.[6] See, e.g., Bldg. Materials Corp. of Am. v. Rotter, 535 F. Supp. 2d 518, 526 n.4 (E.D. Pa. 2008) (citing Babiarz v. Bell Atl.-Pa., Inc., No. 2000-1863, 2001 WL 1808554, at *9 (Pa. Com. Pl. Jul. 10, 2001); and Lakeview Ambulance & Med. Servs., Inc. v. Gold Cross Ambulance & Med. Serv., Inc., No. 1994-2166, 1995 WL 842000, at *1-*2 (Pa. Com.

---

[6]The Restatement (Third) of Unfair Competition provides in relevant part as follows:
> One who causes harm to the commercial relations of another by engaging in a business or trade is not subject to liability to the other for such harm unless:
>> (a) the harm results from acts or practices of the actor actionable by the other under the rules of this Restatement relating to:
>>> (1) deceptive marketing, as specified in Chapter Two;
>>> (2) infringement of trademarks and other indicia of identification, as specified in Chapter Three;
>>> (3) appropriation of intangible trade values including trade secrets and the right of publicity, as specified in Chapter Four;
>> or from other acts or practices of the actor determined to be actionable as an unfair method of competition, taking into account the nature of the conduct and its likely effect on both the person seeking relief and the public . . . .

Restatement (Third) of Unfair Competition § 1.

Pl. Oct. 18, 1995)); <u>ID Sec. Sys. Canada, Inc. v. Checkpoint Sys., Inc.</u>, 249 F. Supp 622, 688 (E.D. Pa. 2003); <u>Yeager's Fuel, Inc. v. Pa. Power & Light Co.</u>, 953 F. Supp. 617, 668 (E.D. Pa. 1997). Under Section 1 of the Restatement, "[a]s a general matter, if the means of competition are otherwise tortious with respect to the injured party, they will also ordinarily constitute an unfair method of competition." <u>Restatement (Third) of Unfair Competition</u> § 1 cmt. g. Nevertheless, the term may not be construed "as a virtual catch-all for any form of wrongful business conduct" or to "include all forms of modern business torts." <u>USX Corp. v. Adriatic Ins. Co.</u>, 99 F. Supp. 2d 593, 619 (W.D. Pa. 2000).

Giordano argues that, to the extent Count Three asserts a claim under Pennsylvania common law (as Claudio argues it does), it asserts a claim for commercial disparagement and thus is subject to a one-year statute of limitations.[7] Giordano further argues that Count Three of the Amended Counterclaim should therefore be dismissed because he sent the Stein Letter on July 23, 2007, and Claudio did not assert an unfair competition or commercial disparagement claim until June 3, 2009 at the earliest. Claudio disputes this interpretation of the legal theory underlying his claim, and it

---

[7]The elements of commercial disparagement in Pennsylvania are as follows:
"(1) the statement is false; (2) the publisher either intends the publication to cause pecuniary loss or reasonably should recognize that publication will result in pecuniary loss; (3) pecuniary loss does in fact result; and (4) the publisher either knows that the statement is false or acts in reckless disregard of its truth or falsity."
<u>Pro Golf Mfg., Inc. v. Tribune Review Newspaper Co.</u>, 809 A.2d 243, 246 (Pa. 2002) (quoting <u>Pro Golf Mfg., Inc. v. Tribune Review Newspaper Co.</u>, 761 A.2d 553, 555-56 (Pa. Super. Ct. 2000)); <u>see also</u> Restatement (Second) of Torts § 623(A) (1977)). In Pennsylvania, claims for commercial disparagement are subject to a one-year statute of limitations. <u>Pro Golf Mfg., Inc.</u>, 809 A.2d at 246. In contrast, claims for unfair competition are subject to Pennsylvania's two-year statute of limitations for tort claims. 42 Pa. Cons. Stat. Ann. § 5524(7); <u>see also</u> <u>Guardian Life Ins. Co. of Am. v. Guardian Life Assurance Co.</u>, 943 F. Supp. 509, 517 (E.D. Pa. 1996), abrogated on other grounds by <u>A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.</u>, 237 F.3d 198, 220-21 (3d Cir. 2000).

is not clear whether Count Three asserts a claim under a theory of commercial disparagement or unfair competition and is therefore subject to a one-year or two-year statute of limitations. Nevertheless, Count Three is not time-barred under either statute of limitations because it is a compulsory counterclaim. Rule 13 provides in part that a counterclaim is compulsory if it "arises out of the transaction or occurrence that is the subject matter of the opposing party's claim." Fed. R. Civ. P. 13(a)(1)(A). We read the phrase "transaction or occurrence" broadly to include "a series of occurrences if they have a logical connection." Baker v. Gold Seal Liquors, Inc., 417 U.S. 467, 468 n.1 (1974) (citing Moore v. N.Y. Cotton Exch., 270 U.S. 593 (1926)). Although Rule 13 does not provide for relation back, the majority view is that "'the institution of plaintiff's suit tolls or suspends the running of the statute of limitations governing a compulsory counterclaim.'" Albert Einstein Med. Care Found. v. Nat'l Benefit Fund for Hosp. & Health Care Employees, Civ. A. No. 89-5931, 1991 WL 114614, at *11 (E.D. Pa. June 21, 1991) (quoting Burlington Indus. v. Milliken & Co., 690 F.2d 380, 389 (4th Cir. 1982)); see also 6 C. Wright & A. Miller, Federal Practice and Procedure § 1419, at 235-36 (2d ed. 1990). The suspension or tolling of the statute of limitations for compulsory counterclaims "precludes plaintiff . . . from delaying the institution of the action until the statute has almost run on defendant's counterclaim so that it would be barred by the time defendant advanced it . . .", and does not prejudice the plaintiff, who "presumably has notice at the time the action is commenced of any counterclaim arising out of the same transaction as the main claim." 6 Wright & Miller, supra, at § 1419.

Claudio's unfair competition claim arises out of the same series of actions by the parties in disputing the Article's authorship as gave rise to Giordano's original claim; accordingly, it is a compulsory counterclaim. The Stein Letter, which serves as the specific basis for Claudio's unfair

competition claim, is dated July 23, 2007. Therefore, Giordano's lawsuit, which was filed less than a year after he sent the Stein Letter, tolled the statute of limitations on Claudio's unfair competition claim. The statute of limitations with respect to all of Claudio's compulsory counterclaims thus was tolled when Giordano instituted the present action on June 19, 2008. Consequently, it is irrelevant whether Count Three is subject to a one-year or two-year statute of limitations, since neither statute of limitations had expired when Giordano initiated his lawsuit.

Giordano spends little time analyzing Claudio's unfair competition claim under the Pennsylvania common law standard, but argues in a footnote that Claudio may not bring an unfair competition claim because he and Giordano are not in the business of publishing articles or selling goods to consumers, and Stein and the JCP are not customers of either Claudio or Giordano. In order to state a claim for unfair competition, a plaintiff must allege that it is in competition with the defendant – that is, that the plaintiff and the defendant "supply[] similar goods or services." Granite State, 57 F.3d at 319; see also Nevyas v. Morgan, 309 F. Supp. 2d 673, 679-80 (E.D. Pa. 2004). Neither party has brought to our attention any authority directly supporting or refuting the proposition that professors in the same field of research may be considered business competitors, or that an authorship credit dispute among professors can give rise to an unfair competition claim. However, the Amended Counterclaim alleges that Claudio and Giordano are competitors in the field of scientific and medical research, as they are both engaged in that profession. (Am. Countercl. ¶ 53.) It also alleges that Stein and the JCP constitute customers for medical and scholarly research. (Id. ¶ 59.) Viewed in the light most favorable to Claudio, the Amended Counterclaim sufficiently alleges the essential elements of unfair competition. While discovery might ultimately establish that Claudio and Giordano are not business competitors, it is impossible to make such a determination

16

at this stage of the litigation.  Accordingly, we deny the Motion to Dismiss as to Count Three of the Amended Counterclaim.[8]

      C.     Count Four: Conversion

Count Four of the Amended Counterclaim asserts a cause of action for conversion on behalf of Claudio.  It alleges that Claudio possessed a cognizable ownership interest in the property constituting the Article.  (Am. Countercl. ¶ 64.)  It also alleges that Giordano removed Claudio's name from the Article without Claudio's consent and without lawful justification.  (Id. ¶¶ 67-68.)  The Amended Counterclaim further alleges that by submitting the Article for publication without designating Claudio as an author and by representing to Stein that Claudio did not merit credit as an author, Giordano deprived Claudio of his rights in that property.  (Id. ¶¶ 65-66.)  Additionally, the Amended Counterclaim alleges that Claudio has been injured as a direct and proximate result of Giordano's removal of his name from the Article as a designated author.  (Id. ¶ 69.)  Giordano argues that Count Four of the Amended Counterclaim fails to state a claim upon which relief because Pennsylvania law precludes claims for the conversion of an intangible property right in a publication.

Pennsylvania law defines "conversion" as "'the deprivation of another's right of property in, or use or possession of, a chattel . . . without the owner's consent and without legal justification.'"  McKeeman v. Corestates Bank, N.A., 751 A.2d 655, 659 n.3 (Pa. Super. Ct. 2000) (quoting Stevenson v. Econ. Bank of Ambridge, 197 A.2d 721 (Pa. 1964)).  While courts in other states have

---

[8]Giordano also argues that Count III of the Amended Counterclaim should be dismissed because it fails to state a claim for unfair competition under the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 Pa. Stat. § 201-1 et seq., on which relief may be granted.  However, the Amended Counterclaim does not specifically assert a claim pursuant to the UTPCPL, and Claudio states in his Response to the Motion to Dismiss that the UTPCPL does not apply to his claim.  (Resp. at 18.)  Consequently, we need not address Giordano's UTPCPL argument.

expanded the tort of conversion to apply to intangible property, in Pennsylvania this expansion is limited "to the kind of intangible rights that are customarily merged in, or identified with, a particular document (for example, a deed or a stock certificate)." Apparel Bus. Sys., LLC v. Tom James Co., Civ. A. No. 06-1092, 2008 WL 858754, at *18 (E.D. Pa. Mar. 28, 2008) (citing Famology.com Inc. v. Perot Sys. Corp., 158 F. Supp. 2d 589, 591 (E.D. Pa. 2001); and Northcraft v. Edward C. Michener Assocs., Inc., 466 A.2d 620, 625 (Pa. Super. Ct. 1983)). The Pennsylvania courts have not recognized a claim for conversion based on intangible property rights in a publication, although they have not expressly foreclosed such a claim.

Claudio argues that Pennsylvania law recognizes conversion claims as a means to vindicate an intangible property interest in published materials. To support his argument, he cites Benaquista v. Hardesty & Associates, 20 Pa. D. & C.2d 227 (Pa. Com. Pl. 1960), in which a three-judge panel of the Allegheny County Court of Common Pleas recognized that "[t]he creator of an unique intellectual production, such as a picture, a book, a play, a compilation of facts or an architectural plan, has a property right in the thing created." Id. at 229. He also relies on Evans v. American Stores Co., 3 Pa. D. & C.2d 160 (Pa. Com. Pl. 1955), in which the Court of Common Pleas permitted an action for conversion of the plaintiff's sports promotion plan. However, Benaquista and Evans are isolated cases decided prior to the emergence of the modern Copyright Act in 1976, and the only Pennsylvania appellate court to analyze these aspects of the Benaquista and Evans decisions did so in the context of acknowledging that they conflicted with other authorities imposing stricter limits on what intangible rights could form the basis for conversion claims. See Northcraft, 466 A.2d at 625 ("'The process of expansion [of the tort of conversion] has stopped with the kind of intangible rights which are customarily merged in, or identified with some document. . . . [T]hus far other

18

remedies apparently have been adequate.'" (quoting Prosser, <u>Torts</u> § 15, at 82-83 (4th ed. 1971))).

Moreover, Claudio does not allege that he owns the Article, as he contends that he is one of its authors, not its publisher or copyright holder. Claudio further relies on <u>Scranton Times, L.P. v. Wilkes-Barre Publishing Co.</u>, Civ. A. No. 08-2135, 2009 WL 3100963 (M.D. Pa. Sept. 23, 2009), in which the publishers of a daily newspaper asserted a claim for conversion based on their ownership of obituaries that had been copied without permission by another newspaper. However, Claudio, unlike the Scranton Times, is not an owner of the property in question, but claims only to be one of many authors.

Furthermore, while Claudio contends that his name was merged into the Article as an attributed author because it initially appeared on the Article, an intangible property right in an article that arises out of one's authorship of that article is not "merged" in the article in the sense that the law requires. Here, the Article is not akin to a certificate of ownership but rather serves as a medium for one instantiation of its authors' work. <u>See</u> <u>Kremen v. Cohen</u>, 337 F.3d 1024, 1032 (9th Cir. 2003) (noting that "an intangible intellectual property right in a song is not merged in a phonograph record in the sense that the record *represents* the composer's intellectual property right" and that the record "is not like a certificate of ownership" but rather represents "a medium for one instantiation of the artistic work"). Therefore, Claudio has not sufficiently alleged merger as required under Pennsylvania law. Accordingly, we grant the Motion to Dismiss with respect to Count Four for failure to state a claim upon which relief may be granted.

      D.    <u>Count Five: Defamation</u>

Count Five of the Amended Counterclaim asserts a cause of action for defamation on behalf of Claudio. It alleges that the Stein Letter, which asserted that Claudio did not merit authorship

credit for the Article, falsely implied that Claudio had engaged in professional misconduct by making a false claim of authorship. (Am. Countercl. ¶¶ 71, 73.) It also alleges that Giordano knew that his statement to Stein was false in that Giordano knew that Claudio merited authorship credit. (Id. ¶74.) The Amended Counterclaim further alleges that the Stein Letter harmed Claudio's professional and academic reputation, deprived him of the co-authorship credit he deserved, lowered the academic community's opinion of him, tended to deter other researchers and students from working with him, and imputed to him a lack of integrity in the conduct of his research. (Id. ¶¶ 72, 76-77.) Giordano argues that Count Five of the Amended Counterclaim should be dismissed for failure to state a claim upon which relief may be granted because (1) the contents of the Stein Letter do not constitute defamation *per se*, and Claudio has not alleged any special damages; and (2) Giordano's statement to Stein was a mere expression of opinion and therefore is not defamatory.

Under Pennsylvania law, in order to state a cause of action for defamation, a plaintiff must allege the following: "(1) The defamatory character of the communication; (2) [i]ts publication by the defendant; (3) [i]ts application to the plaintiff; (4) [t]he understanding by the recipient of its defamatory meaning; (5) [t]he understanding of it as intended to be applied to the plaintiff; (6) [s]pecial harm resulting to the plaintiff from its publication; and [if applicable] (7) [a]buse of a conditionally privileged occasion." 42 Pa. Cons. Stat. Ann. § 8343(a). It is for the court to decide as a matter of law "[w]hether a statement can reasonably be construed as defamatory." Rockwell v. Allegheny Health, Educ. & Research Found., 19 F. Supp. 2d 401, 404 (E.D. Pa. 1998) (citations omitted). A statement is defamatory if it "tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him," or if it "ascribes to another conduct, character or a condition that would adversely affect his fitness

for the proper conduct of his proper business, trade or profession." <u>Maier v. Maretti</u>, 671 A.2d 701, 704 (Pa. Super. Ct. 1995) (citations omitted). In determining whether a statement is defamatory under Pennsylvania law, the court must examine the effect that the statement is calculated to produce and the "'impression it would naturally engender in the minds of the average persons among whom it is intended to circulate.'" <u>Rockwell</u>, 19 F. Supp. 2d at 405 (quoting <u>Gutman v. Tico Ins. Co.</u>, Civ. A. No. 97-5694 1998 WL 306502, at *6 (E.D. Pa. June 9, 1998), and citing <u>Wendler v. DePaul</u>, 499 A.2d 1101, 1103 (Pa. Super. Ct. 1985)). When a statement imputes to the plaintiff, among other things, "conduct incompatible with the plaintiff's business," the statement is slander *per se*, and the plaintiff need not prove pecuniary damages. <u>Brinich v. Jencka</u>, 757 A.2d 388, 397 (Pa. Super. Ct. 2000) (citing <u>Restatement (Second) of Torts</u> §§ 570(a), (c)).

Giordano has attached a copy of the Stein Letter to the Motion to Dismiss.[9] In the Stein Letter, Giordano states that Caracciolo had conducted the experiments forming the basis for the Article and was listed as the first author. He explains that while Caracciolo told him that Claudio "made very helpful comments on the manuscript," she and Macaluso also told him that Claudio did not conduct the experiments or analyze the unexpected data the experiments produced. (Mot. to Dismiss Ex. B.) He further notes, "I will also say that when I had to go to my laboratory in Siena, Dr. Claudio was responsible for some general supervision in the lab at the Sbarro Institute at Temple, but I do not see that this makes him an author of articles written by people in the lab." (<u>Id.</u>) Giordano concludes, "The whole thing with Dr. Claudio since he left our lab has been very sad. I'm sorry that you got caught in the middle." (<u>Id.</u>)

---

[9]Since the Stein Letter is integral to Claudio's defamation claim, we may consider it in ruling on the Motion to Dismiss. <u>See</u> <u>Lum</u>, 361 F.3d at 221 n.3.

The Amended Counterclaim alleges that Giordano's statements in the Stein Letter "have the effect of harming Claudio's reputation as a scientist and a professor and tend to lower Claudio in the opinion of the academic community, and tend to deter other researchers and students from working with him." (Am. Countercl. ¶ 76.) A statement that a professor did not deserve authorship credit would tend to affect his reputation, since a professor's standing in the academic community is closely tied to the quality and quantity of that professor's publications. Viewing the allegations in the light most favorable to Claudio, one could reasonably infer from the facts alleged that Claudio's reputation would decline in the mind of an average person hearing Giordano's statement. Moreover, one could reasonably infer that Giordano's statements impute business misconduct to Claudio, since Claudio has alleged that Giordano was accusing him of making a false claim for authorship. Therefore, we conclude that Claudio has alleged defamation *per se* and does not need to allege special damages.

Next, Giordano argues that his statements in the Stein Letter constituted an expression of opinion that could not be defamatory. It is true that a mere statement of opinion "without more does not create a cause of action in libel." Baker v. Lafayette Coll., 532 A.2d 399, 402 (Pa. 1987) (citing Bogash v. Elkins, 176 A.2d 677 (Pa. 1962)). Rather, "[t]he allegedly libeled party must demonstrate that the communicated opinion may reasonably be understood to imply the existence of undisclosed defamatory facts justifying the opinion." Id. (citing Beckman v. Dunn, 419 A.2d 583, 587 (Pa. Super. Ct. 1980)). The Pennsylvania courts have adopted Section 566 of the Restatement (Second) of Torts, which distinguishes between pure and mixed statements of opinion. Feldman v. Lafayette Green Condominium Ass'n, 806 A.2d 497, 501 (Pa. Commw. Ct. 2002); see also Baker, 532 A.2d at 402 (citing with approval Beckman, 419 A.2d at 587). According to comment (b) to Section 566,

a simple or pure expression of opinion "occurs when the maker of the comment states the facts on which he bases his opinion of the plaintiff and then expresses a comment as to the plaintiff's conduct, qualifications or character;" it may also occur when the maker of the comment "does not himself express the alleged facts on which he bases the expression of opinion," but "both parties to the communication know the facts or assume their existence and the comment is clearly based on those assumed facts and does not imply the existence of other facts in order to justify the comment." Restatement (Second) of Torts § 566 cmt. b (2009).[10]

While Giordano's statements in the Stein Letter constitute an expression of opinion, they also imply that there are undisclosed facts upon which Giordano's opinion is based. Specifically, Giordano's statements that "[t]he whole thing with Dr. Claudio since he left our lab has been very sad" and that he was "sorry that [Stein] got caught in the middle" suggest that there was more to Giordano's opinion of Claudio's contributions to the article than the facts he disclosed in his

---

[10]Comment (c) to the Restatement (Second) of Torts § 566 explains:
A simple expression of opinion based on disclosed or assumed nondefamatory facts is not itself sufficient for an action of defamation, no matter how unjustified and unreasonable the opinion may be or how derogatory it is. But an expression of opinion that is not based on disclosed or assumed facts and therefore implies that there are undisclosed facts on which the opinion is based, is treated differently. The difference lies in the effect upon the recipient of the communication. In the first case, the communication itself indicates to him that there is no defamatory factual statement. In the second, it does not, and if the recipient draws the reasonable conclusion that the derogatory opinion expressed in the comment must have been based on undisclosed defamatory facts, the defendant is subject to liability.

Restatement (Second) of Torts § 566 cmt. c (2009); see also Rockwell, 19 F. Supp. 2d at 406-07 (concluding that defendant's suggestion during a meeting with plaintiff's two supervisors that plaintiff was having an inappropriate sexual relationship and abused time-off were actionable mixed opinion because they were "not founded on disclosed facts" and implied immoral and dishonest activity); Beckman v. Dunn, 419 A.2d 583, 587 (Pa. Super. Ct. 1980) (concluding that professor's statement in a letter to the university provost that graduate student would act "by hook or by crook" was pure expression of opinion where professor had described student's conduct in the letter and had thus indicated the basis of his opinion).

explanation of Claudio's precise role in the generation of the Article. This statement, which implies some other misconduct on the part of Claudio, is an expression of Giordano's opinion and does not provide the basis for that opinion. Reading the Amended Counterclaim in the light most favorable to Claudio, one may reasonably infer that Giordano's statement was actionable mixed opinion. Accordingly, we deny the Motion to Dismiss with respect to Count Five.[11]

     E.    <u>Counts Six and Seven: Defamation</u>

Counts Six and Seven of the Amended Counterclaim assert two additional causes of action for defamation on behalf of Claudio. Count Six alleges that on February 11, 2007, Giordano sent an email ("the Tanaka Email") to Dr. Jacqueline Tanaka at Temple University in which he accused Claudio of (1) stealing notebooks, data, tissue samples, and slides pertaining to work being undertaken by a student in the Sbarro Laboratory; (2) attempting to "hold our Ph.D candidate's professional future hostage;" and (3) withholding data generated by a Ph.D student that the student

---

[11]In a footnote in the Motion to Dismiss, Giordano also suggests that Giordano's statements to Stein were conditionally privileged and therefore not defamatory, since he sent the Stein Letter in response to Stein's request for clarification regarding whether Claudio merited authorship credit, which, in turn, was a response to Claudio's request for an investigation. Conditional privilege attaches to a statement "when the statement is made on a proper occasion, in a proper manner, for a legitimate reason of the speaker and is based on reasonable cause." <u>Rue v. K-Mart Corp.</u>, 691 A.2d 498, 509 (Pa. Super. Ct. 1997) (citation omitted). However, the privilege may be abused "if the communication is made in a reckless or negligent manner or if it exceeds the scope necessary to accomplish its purpose." <u>Id.</u> (citation omitted). Even if one were to assume Giordano's statements were conditionally privileged, one could reasonably infer from the Amended Counterclaim that Giordano exceeded the scope of such a privilege by making false and denigrating statements about Claudio. Moreover, discovery will clarify whether Giordano's statements were privileged and whether he exceeded that privilege. Therefore, it is not appropriate to consider conditional privilege at this stage.

Giordano further argues in his Reply Memorandum that Claudio's defamation claim in Count Five of the Amended Counterclaim is barred by the statute of limitations because it is based on the Stein Letter, which was sent on July 23, 2007. However, the institution of Giordano's lawsuit tolled the statute of limitations on all compulsory counterclaims, including Claudio's defamation claim regarding the Stein Letter.

needed to complete his degree requirements. (Am. Countercl. ¶¶ 80-83.) Count Seven alleges that on February 14, 2007, Giordano sent an email ("the Soprano Email") to Dr. Kenneth Soprano at Temple University in which he accused Claudio of stealing lab books, tissue specimens, slides, and other materials and jeopardizing the research and degree of a Temple student. (Id. ¶¶ 93-94.) The Soprano Email also "specifically solicits Dr. Soprano and Temple University and asks them to take action against Claudio for the alleged theft offenses." (Id. ¶ 95.) The Amended Counterclaim alleges that these statements "impute to Claudio a lack of integrity in the conduct of his research and ascribe to him conduct and character that adversely affects his fitness for his lawful business and profession" and are therefore defamatory. (Id. ¶¶ 84-85, 97-98.) It further alleges that as a result of Giordano's statements, Claudio suffered damages including "harm to his reputation as a researcher and scientist; damage to his reputation as a professor; and costs and fees associated with having to defend himself against false accusations of theft." (Id. ¶¶ 90, 102.) Giordano argues that Count Six must be dismissed because the recipient of the Tanaka Email did not understand its content to be defamatory, and that Counts Six and Seven are both barred by the statute of limitations.

Giordano has submitted the entire chain of emails of which the Tanaka Email is a part. He contends that Tanaka's reply to Giordano's email demonstrates that Tanaka did not understand Giordano's email to have a defamatory meaning with respect to Claudio. Giordano further argues that since Tanaka's reply expressed "enthusiasm for what Claudio has to offer to Giordano's team as a scientist and researcher[,]" it cannot constitute defamation *per se* and that, since Count Six fails to plead special damages, Claudio's defamation claim based on the Tanaka email must be dismissed.

Based on Claudio's allegations and the text of the Tanaka Email, which include accusations that Claudio has "remove[d] University property" and is "hold[ing a] Ph.D. candidate's professional

future hostage" (Mot. to Dismiss Ex. C at 2), we find that the Tanaka Email could reasonably be construed as defamatory.  See Rockwell, 19 F. Supp. 2d at 404 (noting that the Court must decide as a matter of law whether a statement is capable of a defamatory meaning); Dunlap v. Philadelphia Newspapers, Inc., 448 A.2d 6, 10 (Pa. Super. Ct. 1982) (stating that it is for the jury to decide "whether [the statement] was so understood by those who read it") (citing  Corabi v. Curtis Publ'g Co., 273 A.2d 899 (Pa. 1971); and Brophy v. Philadelphia Newspapers, Inc., 422 A.2d 625 (Pa. Super. Ct. 1980)).  Furthermore, Claudio has alleged defamation *per se* with respect to the Tanaka email, since Giordano's statements could reasonably be inferred to impute acts of business misconduct to Claudio.

Giordano also argues that Counts Six and Seven are barred by the statute of limitations because they do not relate to Claudio's claims for co-authorship credit or address any matters implicit in those claims, and were asserted for the first time when Claudio filed the Amended Counterclaim on November 21, 2009, more than two years after the allegedly defamatory emails were sent and more than one year after the expiration of the statute of limitations.  In this Circuit, a Rule 12(b)(6) Motion to Dismiss may raise a statute of limitations defense only if "'the time alleged in the statement of a claim shows that the cause of action has not been brought within the statute of limitations.'"  Robinson v. Johnson, 313 F.3d 128, 135 (3d Cir. 2002) (quoting Hanna v. U.S. Veterans' Admin. Hosp., 514 F.2d 1092, 1094 (3d Cir. 1975)).  However, "'[i]f the bar is not apparent on the face of the complaint, then it may not afford the basis for a dismissal of the complaint under Rule 12(b)(6).'"  Id. (quoting Bethel v. Jendoco Constr. Corp., 570 F.2d 1168, 1174 (3d Cir. 1978)).

Defamation claims are subject to a one-year statute of limitations in Pennsylvania.  42 Pa.

Cons. Stat. Ann. § 5523(1). However, under the discovery rule, "'where the existence of the injury is not known to the complaining party and such knowledge cannot be reasonably ascertained within the prescribed statutory period, the limitations period does not begin to run until the discovery of the injury is reasonably possible.'" Smith v. IMG Worldwide, Inc., 437 F. Supp. 2d 297, 305 (E.D. Pa. 2006) (quoting Gatling v. Eaton Corp., 807 A.2d 283, 289 (Pa. Super. Ct. 2002)). The Pennsylvania courts have recognized that the discovery rule applies to defamation claims. See Gallucci v. Phillips & Jacobs, Inc., 614 A.2d 284, 288 (Pa. Super. Ct. 1992).

The applicability of the discovery rule implicates factual questions regarding when Claudio discovered the content of the Tanaka and Soprano Emails; indeed, Claudio maintains that he did not know about them until October 9, 2009, when Giordano provided copies of the emails in response to discovery requests in this action. Consequently, it is not apparent from the face of the Amended Counterclaim that Counts Six and Seven are barred by the statute of limitations. Accordingly, we deny the Motion to Dismiss with respect to Counts Six and Seven.

F.    Count Eight: Unjust Enrichment, Specific Performance, and Restitution

Count Eight of the Amended Counterclaim asserts a cause of action for unjust enrichment, specific performance, and restitution. It alleges that "[f]or an extended period of time, Claudio worked to write and perfect the Article to the benefit of all the co-authors of the Article," and that Claudio's work therefore "conferred an important and valuable benefit on . . . Giordano" in that Giordano was "able to claim the professional acclaim associated with the Article and Claudio's work." (Am. Countercl. ¶¶ 104-05.) It also alleges that Giordano (1) deliberately denied Claudio authorship credit; (2) has "unjustly received benefits at the expense of Claudio through [his] wrongful conduct"; and (3) "continue[s] to unjustly retain these benefits at the expense of Claudio."

(Id. ¶¶ 106-07.)  It further alleges that "[i]t would be unjust for Giordano . . . to retain anything of value [he] obtained as a result of [his] wrongful conduct" and that Claudio "can only be made whole by an award of specific performance directing Giordano . . . to co-operate with a correction of the deliberate concealment of Claudio's entitlement to co-authorship credit for the Article."  (Id. ¶¶ 107, 109.)  We therefore understand Count Eight as a claim for unjust enrichment, seeking the remedies of specific performance and restitution.  Giordano argues that Count Eight of the Amended Counterclaim must be dismissed because it is preempted by the Copyright Act.

In Pennsylvania, "[u]njust enrichment, . . . an equitable remedy and synonym for *quantum meruit*, is 'a form of restitution.'" Powers v. Lycoming Engines, 328 F. App'x 121, 126 (3d Cir. 2009) (quoting Mitchell v. Moore, 729 A.2d 1200, 1202 n.2 (Pa. Super. Ct. 1999).  Under Pennsylvania law, the elements of unjust enrichment are as follows:  (1) a benefit conferred on the defendant by the plaintiff; (2) appreciation of the benefit by the defendant; and (3) the defendant's acceptance and retention of the benefit "'under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value.'" Filippi v. City of Erie, 968 A.2d 239, 242 (Pa. Commw. Ct. 2009) (quoting Wiernik v. PHH U.S. Mortgage Corp., 736 A.2d 616, 622 (Pa. Super. Ct. 1999)).  Restitution is a remedy for unjust enrichment.  Keystone Floor Prods. Co. v. Beattie Mfg. Co., 432 F. Supp. 869, 880 (E.D. Pa. 1977).  "Where unjust enrichment is found, the law implies a quasi-contract which requires the defendant to pay to plaintiff the value of the benefit conferred." AmeriPro Search, Inc. v. Fleming Steel Co., 787 A.2d 988, 991 (Pa. Super. Ct. 2001) (citing Schenk v. K.E. David, Ltd., 666 A.2d 327, 328-29 (Pa. Super. Ct. 1995)).

Section 301 of the Copyright Act provides that "all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section

28

106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103 . . . are governed exclusively by this title."[12]  17 U.S.C. § 301(a).  Pursuant to this statute, a state law claim that invokes rights "that are 'equivalent' to the exclusive rights within the general scope of copyright" is subject to preemption.  Orson, Inc. v. Miramax Film Corp., 189 F.3d 377, 382 (3d Cir. 1999) (citations omitted).  To determine whether a state law claim is preempted by the Copyright Act, we apply a two-part test, determining (1) "whether the work is the appropriate subject matter of a copyright" as specified in 17 U.S.C. §§ 102 and 103 and (2) "whether the state law creates rights equivalent to the exclusive rights protected by the Copyright Act" as set forth in 17 U.S.C. § 106.  MCS Servs., Inc. v. Johnsen, Civ. A. No. 01-4430, 2002 WL 32348500, at *5 (E.D. Pa. Aug. 13, 2002) (citing Harper & Row Publishers, Inc. v. Nation Enters., 723 F.2d 195, 200 (2d Cir. 1983)).  If a state law cause of action "requires an 'extra element,' in addition to or instead of an act of reproduction, performance, distribution or display that would be prohibited under the Copyright Act, there is no preemption of the state cause of action, provided that 'extra element' changes the nature of the action so that it is qualitatively different from a copyright infringement claim."  County of Del. v. Gov't Sys., Inc., 230 F. Supp. 2d 592, 598 (E.D. Pa. 2002) (citing Rosciszewski v. Arete Assocs., Inc., 1 F.3d 225, 229-30 (4th Cir. 1993); Gates Rubber Co. v. Bando Chem. Indus., Ltd., 9 F.3d 823, 847 (10th Cir. 1993); Kregos v. Associated Press, 3 F.3d 656, 666 (2d Cir. 1993); and Computer Assocs. Int'l, Inc. v. Altai, Inc., 982 F.2d 693, 716 (2d Cir. 1992)).

We find that the Article falls within the type of works protected by the Copyright Act.

_____

[12]The rights protected by Section 106 of the Copyright Act are the rights of reproduction, adaptation, publication, performance, display, and broadcast.  17 U.S.C. § 106.

"Literary works," which are "works . . . expressed in words" and include periodicals, constitute works of authorship and are thus protected by the Copyright Act. 17 U.S.C. §§ 101, 102(a)(1). The Article (a copy of which is attached to the Motion to Dismiss) handily fits the definition of a literary work; indeed, it bears a copyright insignia on its first page. (See Mot. to Dismiss Ex. A.)

Claudio argues, however that his claim is not preempted because it concerns the right of authorship attribution and therefore falls outside the scope of the Copyright Act. The right of attribution with respect to a published article is not protected by the Copyright Act. UMG Recordings, Inc. v. Disco Azteca Distribs., Inc., 446 F. Supp. 2d 1164, 1178 (E.D. Cal. 2006). Rather, the right of attribution appears most frequently in the context of the Visual Artists Rights Act ("VARA"), an amendment to the Copyright Act that protects the "moral rights" of visual artists. 17 U.S.C. § 106A(a)(1)(A); see also Hunter v. Squirrel Hill Assocs., L.P., 413 F. Supp. 2d 517, 519 (E.D. Pa. 2005). However, it appears that Claudio's unjust enrichment claim is based on a "reverse passing off" theory of liability, since he claims that Giordano represented his work as Giordano's own by failing to properly acknowledge his contribution to the Article. "[R]everse passing off occurs when one markets, sells, and represents the goods or services of another as its very own . . . ." Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc., 210 F. Supp. 2d 552, 565 (D.N.J. 2002). Courts in this Circuit have held that claims premised on a reverse passing off theory fail the extra element test and thus are preempted by the Copyright Act. See, e.g., Scranton Times, 2009 WL 3100963, at *6-*7; Schiffer Publ'g, Ltd. v. Chronicle Books, LLC, 350 F. Supp. 2d 613, 619-20 (E.D. Pa. 2004); Video Pipeline, 210 F. Supp. 2d at 565. Claudio has not alleged an "extra element" in conjunction with his unjust enrichment claim that would render that claim qualitatively different from a copyright infringement claim. Therefore, we find that Count Eight of the Amended

Counterclaim is functionally equivalent to a copyright claim.

Claudio maintains, however, that his claim is not preempted because he has not asserted, nor could he assert, a copyright claim. While the United States Court of Appeals for the Third Circuit has not addressed this issue, the majority of circuit courts to have addressed it have held that "the scope of the Copyright Act's subject matter is broader than the scope of the Act's protections." Wrench LLC v. Taco Bell Corp., 256 F.3d 446, 455 (6th Cir. 2001); see also United States ex rel. Berge v. Bd. of Trustees of the Univ. of Ala., 104 F.3d 1453, 1463 (4th Cir. 1997) (stating that "the shadow actually cast by the Act's preemption is notably broader than the wing of its protection"); Nat'l Basketball Ass'n v. Motorola, Inc., 105 F.3d 841, 848-50 (2d Cir. 1997); ProCD, Inc. v. Zeidenberg, 86 F.3d 1447, 1453 (7th Cir. 1996). But see Dunlap v. G&L Holding Group, Inc., 381 F.3d 1285, 1295 (11th Cir. 2004) (holding that "because ideas are substantively excluded from the protection of the Copyright Act, they do not fall within the subject matter of copyright"). To the extent that Claudio seeks reimbursement for any "enrichment" received by Giordano for the use of Claudio's uncredited work on the Article, his allegations stem from the harm he allegedly suffered because Giordano represented Claudio's work as his own, and we conclude that this claim is preempted by the Copyright Act.

Additionally, to the extent Claudio alleges a claim for specific performance, we note that specific performance is an equitable remedy for breach of contract permitting the court "'to compel performance of a contract when there exists in the contract an agreement between the parties as to the nature of the performance.'" Lackner v. Glosser, 892 A.2d 21, 31 (Pa. Super. Ct. 2006) (quoting Geisinger Clinic v. Di Cuccio, 606 A.2d 509, 521 (Pa. Super. Ct. 1992)) (emphasis omitted). The Amended Counterclaim does not refer to or allege the existence of a contract between Giordano and

Claudio.  Therefore, we find that Count Eight of the Amended Counterclaim fails to state a claim for specific performance.  Accordingly, we grant the Motion to Dismiss with respect to Count Eight.

      G.    Count Nine: Abuse of Process

Count Nine of the Amended Counterclaim alleges a claim for abuse of process on behalf of Claudio and Waters based on Giordano's filing of his lawsuit against them.  It states that the instant suit was "manufactured and filed primarily to promote Giordano's ulterior purpose of harassing, intimidating and punishing Claudio and Waters in an attempt to cause them to discontinue seeking proper authorship recognition for Claudio . . . which necessarily would result in the exposure of the plagiarism and academic fraud perpetrated by Giordano." (Am. Countercl. ¶ 113.)  It further alleges that the primary intent of Giordano's lawsuit was to:  "(1) harass[], intimidat[e] and punish[] Claudio and Waters for their justified acts bringing to light the plagiarism and academic fraud of Giordano; (2) caus[e] Claudio to cease in his cooperation with the [disciplinary] tribunal constituted by Temple University . . . ; and (3) extort[] an interest in certain patent pending technology from Claudio for which there exists no justifiable claim."  (Id. ¶ 115.)  Count Nine also alleges that Claudio and Waters "have been harmed by Giordano's willful acts in that they have incurred expenses for attorney's fees and costs in defending this action and will continue to incur additional expenses." (Id. ¶ 116.)  Giordano contends that Count Nine of the Amended Counterclaim should be dismissed because (1) it actually avers a claim for wrongful use of civil proceedings, which cannot be asserted until the allegedly wrongful civil proceedings have been terminated in the favor of the party asserting the claim; and (2) in any event, the claim is premature.  Claudio and Waters aver that they are not asserting a claim for wrongful use of civil proceedings and maintain that they have sufficiently stated a claim for abuse of process.

The Pennsylvania courts have defined abuse of process as "'the use of legal process against another primarily to accomplish a purpose for which it is not defined.'" Werner v. Plater-Zyberk, 799 A.2d 776, 785 (Pa. Super. Ct. 2002) (quoting Shiner v. Moriarty, 706 A.2d 1228, 1236 (Pa. Super. Ct. 1998)). "'To establish a claim for abuse of process, [a plaintiff must show] that the defendant (1) used a legal process against the plaintiff, (2) primarily to accomplish a purpose for which the process was not designed; and (3) harm was caused to the plaintiff." Id. (quoting Shiner, 627 A.2d at 192). Abuse of process also requires that there be "an act or threat not authorized by the process, or the process must be used for an illegitimate aim such as extortion, blackmail, or to coerce or compel the plaintiff to take some collateral action.'" Al Hamilton Contracting Co. v. Cowder, 644 A.2d 188, 192 (Pa. Super. Ct. 1994) (citing Rosen v. Tesoro Petroleum Corp., 582 A.2d 27, 32-33 (Pa. Super. Ct. 1990)).

Despite Claudio and Waters's assertions to the contrary, the allegations in the Amended Counterclaim all refer to Giordano's initiation of the lawsuit against Claudio and Waters, and not to any subsequent action taken by Giordano in the lawsuit. Regardless of whether Count Nine of the Amended Counterclaim asserts a claim for abuse of process or wrongful use of civil proceedings, however, it is not ripe. While a claim for wrongful use of civil proceedings may not be brought until "[t]he proceedings have terminated in favor of the person against whom they are brought," 42 Pa. Cons. Stat. Ann. § 8351(a)(2), a litigant need not always wait until the termination of an action to bring a claim for abuse of process. See Rosen v. Am. Bank of Rolla, 627 A.2d 190, 192 (Pa. Super. Ct. 1993) (noting that "it is immaterial [in an abuse of process claim] . . . that the proceedings terminated in favor of the person instituting or initiating [the process]" (quoting Restatement (Second) of Torts § 682 cmt. a)). However, the allegedly abusive process that forms the basis for

an abuse of process claim must be completed before a litigant may bring an abuse of process claim; this is so "whether it allegedly encompasses the entire litigation, or a portion thereof . . . ." <u>Access Fin. Lending Corp. v. Keystone State Mortgage Corp.</u>, Civ. A. No. 96-191, 1996 WL 544425, at *5 and n.3 (W.D. Pa. Sept. 4, 1996) ("The assertion, by way of a counterclaim, that the underlying litigation as a whole constitutes an abuse of process fails to state a claim which is ripe for adjudication. By definition, a lawsuit in its entirety cannot constitute an abuse of process when it has not yet been concluded.") The reason for this requirement is "so that the factfinder can determine the primary reason" for the use of the allegedly abusive process. <u>Id.</u> at *5 n.3. Here, since the Amended Counterclaim refers only to Giordano's initiation of the lawsuit and not to any discrete portions of the lawsuit (such as a subpoena or a discovery request), we cannot adjudicate Claudio and Waters's abuse of process claim until the completion of Giordano's lawsuit. Accordingly, we grant the Motion to Dismiss with respect to Count Nine.

> H.      Count Ten: Civil Conspiracy

Count Ten of the Amended Counterclaim alleges that Giordano's actions "constitute a civil conspiracy which [Giordano, along with Caracciolo and Macaluso] formed and put into operation" and that Claudio has suffered damages as a result of actions taken in furtherance of the common design. (Am. Countercl. ¶¶ 118-19.) Giordano argues that Count Ten must be dismissed for failure to state a claim upon which relief may be granted because it does not sufficiently allege the necessarily element of malice. In order to state a cause of action for civil conspiracy, "a complaint must allege (1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damage." <u>McKeeman</u>, 751 A.2d at

34

660 (citing <u>McGuire v Shubert</u>, 722 A.2d 1087, 1092 (Pa. Super. Ct. 1998)). A claim for civil conspiracy "must be based on a free-standing cause of action . . . ." <u>Bro-Tech Corp. v. Thermax, Inc.</u>, 651 F. Supp. 2d 378, 418 (E.D. Pa. 2009); <u>see also</u> <u>McKeeman</u>, 751 A.2d at 660 ("'[A]bsent a civil cause of action for a particular act, there can be no cause of action for civil conspiracy to commit that act.'" (quoting <u>Pelagatti v. Cohen</u>, 536 A.2d 1337, 1342 (Pa. Super. Ct. 1987))). Additionally, to prevail on a civil conspiracy claim, a plaintiff must prove malice, or "'that the *sole* purpose of the conspiracy was to injure the plaintiffs.'" <u>Bro-Tech</u>, 651 F. Supp. 2d at 419 (quoting <u>Morilus v. Countrywide Home Loans, Inc.</u>, 651 F. Supp. 2d 292, 313 (E.D. Pa. 2008)) (internal quotations omitted). A showing that an alleged conspirator acted for professional or business benefit will preclude a finding of malice. <u>Id.</u> (citing <u>Spitzer v. Abdelhak</u>, Civ. A. No. 98-6475, 1999 WL 1204352, at *9 (E.D. Pa. Dec. 15, 1999)).

Giordano argues that Claudio's civil conspiracy claim cannot allege malice as the sole purpose of the alleged defamation, since it is based on his claim for defamation arising out of the Stein Letter, which shares a common nexus with Claudio's unfair competition claim, which in turn alleges that Giordano took action for an improper business purpose. However, we find that Count Five of the Amended Counterclaim, which alleges that Giordano's defamatory statements were injurious to Claudio and that Giordano knew that they were false, sufficiently alleges malice. Additionally, one could reasonably infer from the allegation that Giordano told Stein that Caracciolo and Macaluso could verify his statements that Giordano conspired with Caracciolo and Macaluso in making the statements. Therefore, we deny the Motion to Dismiss with respect to Count Ten.

## IV.    CONCLUSION

For the foregoing reasons, we grant the Motion to Dismiss with respect to Claudio's

counterclaims for misrepresentation (Count 2); conversion (Count 4); unjust enrichment, restitution, and specific performance (Count 8); and abuse of process (Count 9); and deny it with respect to Claudio's counterclaims for fraud (Count 1); unfair competition (Count 3); defamation (Counts 5, 6, and 7); and civil conspiracy (Count 10).  An appropriate Order follows.

BY THE COURT:


 /s/ John R. Padova
John R. Padova, J.